# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOEL SNIDER, | : | CIVIL NO: 4:13-CV-01226 |
| | : | |
| Plaintiff, | : | |
| | : | (Judge Brann) |
| v. | : | |
| | : | (Magistrate Judge Schwab) |
| WARDEN JACQUELINE MOTTER, | : | |
| | : | |
| *et al.*, | : | |
| | : | |
| Defendants. | : | |

## REPORT AND RECOMMENDATION

In this 42 U.S.C. § 1983 civil action, proceeding *via* a second amended complaint, plaintiff Joel Snider ("Snider"), currently an inmate at SCI-Greene, raises claims against Clinton County Correctional Facility ("CCCF"). Snider claims that the defendants violated his rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and also alleges that CCCF violated the Americans with Disabilities Act ("ADA"). Currently before this Court are two motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Based on the reasons set forth below, we recommend that the motions to dismiss be denied at this stage of the proceedings.

I.    **Facts and Procedural History**.

This action was initiated on May 6, 2013, when Snider filed his initial

complaint, which named over sixty defendants.  Then, on October 23, 2014, Snider

filed an amended complaint against all of the defendants named in the first

complaint.  Finally, on December 19, 2015, Snider's counsel filed a second

amended complaint (*doc. 222*) which dropped many of the defendants named in his

original complaint, and identified the following as defendants: (1) Warden

Jacqueline Motter ("Warden Motter"); (2) Lieutenant Smith ("Smith");

(3) Correctional Officer Nolte ("Nolte"); (4) Correctional Officer Shearer

("Shearer"); (5) Correctional Officer Goshorn ("Goshorn"); (6) Correctional

Officer Grimes ("Grimes"); (7) Correctional Officer Gray ("Gray");

(8) Correctional Officer Walker ("Walker"); (9) Correctional Officer Hughes

("Hughes"); (10) Correctional Officer Richards ("Richards"); (11) Nurse Rupert;

(12) Nurse Andrus; and (13) CCCF.  According to Snider, at all times relevant to

the second amended complaint, the twelve individuals named as defendants were

all employed by the thirteenth defendant, CCCF.  *Doc. 222* at ¶¶ 6-17.

Per his second amended complaint, Snider was incarcerated at CCCF as a

pretrial detainee from December 6, 2012, until May 7, 2013.  *Id*. at ¶¶ 4, 19.

Snider suffers from mental illness, depression, and chronic paranoid schizophrenia,

all which have an adverse impact on multiple aspects of his daily life, and he

struggled with this mental illness throughout his incarceration at CCCF.  *Id*. at ¶¶ 20-21.  Snider alleges that even though employees and administrators at CCCF were aware of his mental illness, they failed to take this into consideration when determining the amount of force to be utilized, failed to provide him with any accommodations with respect to the disciplinary process, and subjected him to ongoing retaliation and harassment related to both his mental illness and his religion.  *Id*. at ¶¶ 22, 25-27.

The series of events of which Snider complains began in February 2013.  On February 28, 2013, thirteen days after Snider's psychiatrist had increased his medication to combat the symptoms of his mental illness, Nolte entered into Snider's cell while he was sleeping, awakened him, and yelled multiple "confusing" orders at him.  *Id*. at ¶¶ 28-30.  Later that day, Snider went to Smith's office to complain that Nolte, Richards, and Shearer had stolen his religious materials and to complain of Nolte's harassment from earlier that morning.  Smith "laughingly" told Snider that he would "take care of it" and ordered him back to his block.  *Id*. at ¶¶ 32-33.  Shortly thereafter, Snider was called back to Smith's office where he was presented with a misconduct written by Nolte for "refusing to obey all orders," even though Snider alleges that he attempted to comport with Nolte's earlier confusing orders to the best of his ability.  *Id*. at ¶¶ 31, 34.

As punishment for the misconduct, Hughes, Richards, and Walker shackled Snider's legs and arms behind his back in an "excessively tight manner" causing "extreme pain," and they began to escort Snider to the L unit or "hole." *Id*. at ¶¶ 35-37.   While transporting Snider down the hall, Hughes, Richards, and Walker moved and pushed Snider down the hall faster than he was able to walk, despite the fact that Snider informed them that the shackles were painfully cutting into his ankles; this ultimately caused Snider to fall. *Id*. at ¶¶ 38-40.   After Snider fell, Hughes, Richards, and Walker "tackled" him, pulled on him by his handcuffs and shackles, and dragged him down the hall and stairs into a cell. *Id*. at ¶¶ 41-43.   As a result of this incident, Snider alleges he suffered from painful and swollen wrists; numb thumbs; pain in his neck, ankles, and shoulders; and increased anxiety. *Id*. at ¶ 44, 46.   Despite describing many of his injuries to Nurse Rupert, she refused to provide Snider with any treatment, prompting him to later file a grievance against her on March 1, 2013. *Id*. at ¶¶ 44-45, 47.   Three days after filing the grievance against Nurse Rupert, Snider was evaluated by another nurse, Nurse McGill, who evaluated him and prescribed Tylenol and ice for his injuries. *Id*. at ¶¶ 48-49.

On April 5, 2013, Snider visited with his psychiatrist, Dr. Calvert, who documented that Snider had been continuously hearing voices; suffering from hallucinations; and experiencing depersonalization, derealization, and symptoms of Post-Traumatic Stress Disorder. *Id*. at ¶¶ 50-51.   In addition to the medications

Snider was already taking, Dr. Calvert prescribed Risperdal, a powerful anti-psychotic.  *Id*. at ¶ 52.  Later that evening, Shearer allegedly gave Snider a misconduct for failing to wear his nametag.  *Id*. at ¶ 53.  Shearer then entered Snider's cell, yelled at him, and then left the cell taking Snider's religious book of Hindu scripture with him.  *Id*. at ¶¶ 54-55.  In response, Snider then struck the door of the cell with his hand, prompting Shearer to issue Snider additional misconducts.  *Id*. at ¶¶ 56-59.

After Shearer issued such misconducts, unspecified corrections officers attempted to again transfer Snider to the L block, but Snider refused such transfer.  *Id*. at ¶¶ 60-61.  Snider repeatedly requested that the corrections officers summon Deputy Warden Bechtel, who allegedly acted frequently as a mediator on behalf of inmates experiencing difficulties with other corrections officers.  *Id*. at ¶¶ 62-63.  The corrections officers continued to yell at Snider as he sat back down in his cell and "began meditating to stay calm."  *Id*. at ¶ 64.  Ultimately, a "cell extraction team" consisting of Smith, Nolte, Goshorn, Gray, Shearer, Grimes, and Corrections Officer Edgar was summoned to Snider's cell.  *Id*. at ¶ 65.  Smith knocked on the cell door and ordered Snider to come to the door to be handcuffed, but Snider refused to do so, verbally expressing a fear that some of the corrections officers would steal his property.  *Id*. at ¶¶ 67-69.  In response, Smith opened Snider's cell door, sprayed him directly in the face with pepper spray, and then

closed the door.  *Id*. at ¶ 71-72.  Snider remained seated in the back of his cell where he repeatedly yelled out in pain and repeatedly exclaimed, "Jesus."  *Id*. at ¶¶ 73, 75.  Subsequently, Smith opened the cell door once more and again sprayed Snider in the face with pepper spray.  *Id*. at ¶ 76.  In response, Snider "continued pleading to Jesus and begging the correctional officers to stop stealing his things." *Id*. at ¶ 78.

After Snider was sprayed with pepper spray the second time, the extraction team entered his cell, piled on top of him, and held his arms and legs down.  *Id*. at ¶ 80.  Even though Snider was allegedly not resisting, some members of the extraction team punched and kneed him in the face and struck his head on the floor repeatedly.  *Id*. at ¶ 81.  Extraction-team members then dragged and lifted Snider into the air by his leg and wrist shackles, causing him to "call[] out to Jesus" and cry out in pain so severe that he thought his wrists had been broken.  *Id*. at ¶¶ 83-86.  Although extraction-team members ordered Snider to "start walking," Snider expressed that he was unable to see or keep his footing because his eyes were swollen from the pepper spray; thus, the extraction-team members again lifted him into the air to carry him to the L block.  *Id*. at ¶¶ 87-90.  Snider alleges that all the while he "continued to pray to Jesus" and did not fight or resist, despite being in severe pain and being choked at one point by the collar of his prison jumpsuit.  *Id*. at ¶¶ 91-95.

When Snider and the extraction-team members arrived at a "shower cell," Smith ordered Snider to remove his clothes, but Snider was in too much pain to comply.  *Id.* at ¶¶ 96-97.  Consequently, members of the extraction team undressed him and performed a strip search.  *Id.* at ¶ 97.  Then, Snider was placed into a shower, and even though CCCF staff was allegedly aware that a special solution was needed to neutralize and ameliorate the irritating effects of pepper spray and that water alone worsens the effects of pepper spray, he was not provided any soap or solution to wash off the pepper spray.  *Id.* at ¶¶ 98-101.  Thus, when Snider turned on the water, this caused the residue of the pepper spray to be reactivated and to run deeper into his eyes and down the rest of his body, including his genitals and anus.  *Id.* at ¶ 102.  As such, the pain and irritating effects from the pepper spray were exacerbated, and throughout the rest of the day and night, Snider's pain was so severe that it caused him to shake, made it difficult to open his eyes or sit down, and prevented him from sleeping because his skin continuously felt like it was on fire.  *Id.* at ¶¶ 103, 108-09.  Additionally, as a result of the incidents that had occurred earlier that day, Snider sustained a swollen and blackened left eye; a swollen and cut nose; a cut ear; a large knot on his forehead; and swelling and redness of his ankles, wrists, and left arm.  *Id.* at ¶ 104.  Snider alleges that despite being aware of these injuries, Nurses Andrus and Rupert refused to treat him.  *Id.* at ¶¶ 105-06.

The next day, April 6, 2013, Smith returned to Snider's cell and laughingly commented on the intensity of the pepper spray used on Snider and the fact that Snider had not yet been allowed a "full shower." *Id*. at ¶¶ 111-12. Smith then permitted Snider to exit his cell and take a shower with soap, which alleviated the burning of the pepper spray on Snider's skin. *Id*. at ¶ 113. Subsequently, Goshorn and Shearer allegedly discussed the April 5, 2013, incidents with multiple inmates and told them that excessive force had been used on Snider because he "didn't fight back." *Id*. at ¶ 114. During these discussions with the inmates, Shearer also allegedly ridiculed Snider's religion and made fun of him for repeatedly "calling out to Jesus" while he was being sprayed with the pepper spray. *Id*. at ¶ 115. On April 23, 2013, Snider still suffered from neck, wrist, and hand pain as well as numbness in this thumbs from the April 5 incident, and Nurse Edwards prescribed him ibuprofen and analgesic cream for these injuries. *Id*. at ¶¶ 118-19.

On May 7, 2013, Snider was transferred to SCI-Coal Township, where he was placed in solitary confinement with little access to the law library. *Id*. at ¶ 120. On June 6, 2013, Snider attempted suicide by hanging himself in his cell. *Id*. at ¶ 121. After the suicide attempt, Snider was resuscitated, hospitalized, and spent a number of months in a mental health facility. *Id*. at ¶¶ 122. Snider is currently an inmate at SCI-Greene, where he has been housed since October 2014. *See doc. 56*.

In his second amended complaint, Snider raises five causes of actions against CCCF and various CCCF employees.  Count I of the second amended complaint, which is raised against Hughes, Richards, and Walker, alleges use of excessive force in violation of the Fourteenth Amendment in connection with the events which occurred at CCCF on February 28, 2013.  Count II, which is raised against Smith, Nolte, Shearer, Goshorn, Grimes, and Gray, alleges excessive force in connection with the events that occurred at CCCF on April 5, 2013.  Count III raises an excessive force claim against Warden Motter, alleging that she "enforced a policy or practice allowing the use of objectively unreasonable force in cell extractions against inmates with serious mental illness."  Count IV raises Eighth Amendment cruel and unusual punishment claims against Nurses Andrus and Rupert, alleging that these two nurses were deliberately indifferent to Snider's medical needs.  Finally, Count V alleges that CCCF violated the ADA by discriminating against Snider and failing to provide him with reasonable accommodations for his serious mental illness.  Snider seeks a declaratory judgment that the defendants violated his constitutional rights.  He also seeks compensatory and punitive damages as well as attorney's fees and costs.

On January 4, 2016, Nurses Andrus and Rupert filed a motion (*doc. 224*) to dismiss Snider's second amended complaint for failure to state a claim.  Then, on January 11, 2016, CCCF also filed a motion (*doc. 226*) to dismiss the second

amended complaint for failure to state a claim.  This Court now considers these two motions.

## II.   <u>Discussion</u>.

### A. Motions to Dismiss for Failure to State a Claim – Standard of Review.

All defendants' motions to dismiss for failure to state a claim are brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Rule 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Under Rule 12(b)(6), we must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)). While a complaint need only contain "a short and plain statement of the claim," Fed.R.Civ.P. 8(a)(2), and detailed factual allegations are not required, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  "[L]abels and

conclusions" are not enough, and a court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoted case omitted).

In resolving a motion to dismiss, we thus "conduct a two-part analysis." *Fowler*, 578 F.3d at 210. First, we separate the factual elements from the legal elements and disregard the legal conclusions. *Id.* at 210–11. Second, we "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoted case omitted). While traditionally focused upon the allegations contained in a complaint, a court may also consider exhibits attached to a complaint, matters of public record, and "an undisputedly authentic document" relied upon by the plaintiff and attached as an exhibit to a defendant's motion to dismiss. *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

## B. Motion to Dismiss – Medical Defendants.

Snider alleges that Nurses Andrus and Rupert violated the Eighth Amendment's Cruel and Unusual Punishment Clause by refusing to treat him and, therefore, exhibiting deliberate indifference to the injuries he sustained at the hands of some of the other defendants on February 28, 2013 and April 5, 2013.

We note from the outset that according to Snider's second amended complaint, he was a pretrial detainee at all times relevant to his factual allegations.

As a general rule, when considering a pretrial detainee's complaint regarding prison conditions, an Eighth Amendment analysis is inappropriate for "determining if the conditions of confinement rise to the level of a constitutional violation." *Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2010).  Rather, when pre-trial detainees complain of a prison's conditions, an analysis under the Fourteenth Amendment Due Process clause is more appropriate.  *See Boring v. Kozakiewicz*, 833 F.2d 468, 471 (3d Cir. 1987) ("Pretrial detainees are not within the ambit of the Eighth Amendment but are entitled to the protections of the Due Process Clause.").  Nonetheless, the courts "have found no reason to apply a different standard than the [Eighth Amendment] standard . . . when evaluating whether a claim for inadequate medical care by a pre-trial detainee is sufficient under the Fourteenth Amendment."  *Sylvester v. City of Newark*, 120 Fed.Appx. 419, 423 (3d Cir. 2005) (citing *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003)).  Thus, even though Snider was a pretrial detainee when all relevant events occurred, his claims against Nurses Andrus and Rupert shall be analyzed under the Eighth Amendment standard.

In order for a plaintiff to establish an Eighth Amendment medical-care claim, he must establish that the defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *see also Groman v. Township of Manalapan,* 47 F.3d 628, 637 (3d Cir. 1995) ("Failure to provide

medical care to a person in custody can rise to the level of a constitutional violation under § 1983 only if that failure rises to the level of deliberate indifference to that person's serious medical needs."). Thus, "the standard enunciated in *Estelle* is two-pronged: '[i]t requires deliberate indifference on the part of the prison officials and it requires the prisoner's medical needs to be serious.'" *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) (quoting *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978)).

Deliberate indifference, the first prong of the *Estelle* test, is a subjective standard. *See Farmer v. Brennan*, 511 U.S. 825, 840 (1994). "To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm." *Giles v. Kearney,* 571 F.3d 318, 330 (3d Cir. 2009). To elaborate, the prison official must have known of the substantial risk of serious harm and must have disregarded that risk by failing to take reasonable measures to abate it. *Farmer,* 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

The Third Circuit has found deliberate indifference where a prison official: "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical

treatment." *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir. 1999). The Third Circuit has also held that "[n]eedless suffering resulting from the denial of simple medical care, which does not serve any penological purpose, . . . violates the Eighth Amendment" and amounts to deliberate indifference. *Atkinson v. Taylor,* 316 F.3d 257, 266 (3d Cir. 2003).

At the same time, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as a constitutional claim because medical malpractice is not a constitutional violation. *See Spruill v. Gillis,* 372 F.3d 218, 235 (3d Cir. 2004); *Singletary v. Pa. Dep't of Corr.,* 266 F.3d 186, 192 n. 2 (3d Cir. 2002) (claims of medical malpractice, absent evidence of a culpable state of mind, do not constitute deliberate indifference under the Eighth Amendment). Instead, deliberate indifference represents a much higher standard, one that requires "obduracy and wantonness, which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk." *Rouse*, 182 F.3d at 197 (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)). "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir. 1993) (citations omitted). Furthermore, if a plaintiff's claims amount to a simple disagreement with medical officials as to the course of treatment, this does not

amount to deliberate indifference. *See Douglas v. Hill*, 1996 WL 716278, at \*7 (E.D. Pa. Dec. 6, 1996) (citing *Boring*, 833 F.2d at 473).

With respect to the second prong of the *Estelle* test, a prison official's deliberate indifference constitutes an Eighth Amendment violation "only if it is directed toward a 'serious medical need.'" *Lanzaro*, 834 F.2d at 348. Generally, "a medical need is 'serious' . . . if it is 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" *Id*. at 347 (citation omitted). Additionally, a medical need may be considered "serious" by "reference to the effect of denying . . . treatment." *Id*. Where denial or delay of medical care results in "unnecessary and wanton infliction of pain" or "causes an inmate to suffer a life-long handicap or permanent loss," the medical condition is considered "serious." *Id.* (internal quotations omitted). Additionally, when a defendant fails to treat a plantiff at all, this Court has suggested that permanent injury or lasting effects need not be shown to qualify an injury as "serious;" rather, in assessing the "seriousness" of a plaintiff's injury the *nature* of the injury sustained rather than its actual lasting effects may be considered. *See Freeman v. Frimpong*, 2007 WL 570160, at \*6 n.6 (M.D. Pa. Feb. 15, 2007) ("[F]ocusing on the outcome of a refusal to treat a serious illness rather than on the nature of the illness when a defendant chose not to treat it would allow defendants with the good fortune not to

cause permanent injuries to violate prisoner's constitutional rights without being held accountable.").

### 1. Non-Pepper-Spray Injuries.

Snider alleges that he sustained a multitude of physical injuries following both incidents of alleged excessive force recounted in his complaint.  As a result of the February 28, 2013, incident, he suffered from painful and swollen wrists; numb thumbs; and pain in his neck, ankles, and shoulder.  As a result of the April 5, 2013, incident, Snider alleges he sustained a swollen and blackened left eye; a swollen and cut nose; a cut ear; a large knot on his forehead; and swelling and redness of his ankles, wrists, and left arm.  Snider alleges that despite being aware of these injuries, Nurses Andrus and Rupert refused to treat him following these incidents.  Thus, given the alleged complete refusal to treat Snider, it cannot be said at this point that Snider is merely disagreeing with the treatment provided or that he is alleging negligence in the treatment provided with respect to these injuries.  Indeed, courts recognize that when knowledge of a need for medical care is accompanied by an intentional refusal to provide that care, this amounts to deliberate indifference.  *Spruill*, 372 F.3d at 235; *see also Kennedy v. S.C.I Rockview Employees and Medical Employees*, 2010 WL 4853959, at *4 (M.D. Pa. Nov. 22, 2010) ("Although 'mere disagreement' with treatment protocol does not support an Eighth Amendment claim, liability attaches when officials . . . *withhold*

treatment in deliberate indifference to medical needs.") (emphasis added) (citation omitted).

Even if their complete refusal to deny medical treatment does amount to deliberate indifference, Nurses Andrus and Rupert argue that Snider's non-pepper spray injuries were merely "minor cuts, bumps, bruises, and swelling," and that he has "not alleged any ongoing symptoms, physical limitations, disability, [or] permanent loss . . . ." *Doc. 225* at 9. Thus, Andrus and Rupert contend that these injuries were not sufficiently "serious" to satisfy the second prong of the *Estelle* test. As alluded to before, however, when a plaintiff alleges a complete denial of medical treatment, it may be more appropriate for a court to look at the nature of an injury rather than the existence of the fact of permanent loss. Additionally, it should be noted that serious medical needs "range from those which if left untreated would produce 'physical torture or lingering death' to less serious cases causing 'pain and suffering which no one suggests would serve any penological purpose.'" *Winslow v. Prison Health Servs.*, 2008 WL 4722505, at *3 (M.D. Pa. Oct. 23, 2008) (quoting *Estelle*, 429 U.S. at 105). Thus, just because Snider's non-pepper-spray injuries did not pose a threat of imminent death, torture, or permanent injuries does not automatically warrant a conclusion that the injuries were not serious.

Snider further alleges that during both the February 28 and April 5, 2013, incidents between him and the officers, the officers pulled on his cuffs and shackles with such force that it caused him severe pain, pain so severe that he believed at one point his wrists had been broken.  And at least following the February 28 incident, Snider alleges that subsequent to Rupert's refusal to provide him with any treatment for his injuries, he endured suffering from painful wrists; numb thumbs; and pain in his neck, ankles, and shoulders.  Following the April 5 incident, Snider alleges that he suffered from a swollen and blackened left eye; a swollen and cut nose; a cut ear; a large knot on the forehead; and swelling of the wrists, ankles, and left arm—all which Rupert and Andrus refused to treat.  Thus, based on these allegations, it would not be unreasonable to conclude that the complete refusal to treat him resulted in unnecessary pain and suffering that did not serve any penological interest, and at this early stage of the case, that is enough for Snider to survive a motion to dismiss.

### 2. Pepper-Spray Injuries

Snider also complains that Nurses Andrus and Rupert were aware of the pain he endured due to the pepper spray and that they failed to provide any treatment for his suffering.  Nurses Andrus and Rupert argue that Snider was afforded the opportunity to take a shower after he was sprayed with the pepper spray, that this

constituted a "treatment," and that Snider's dissatisfaction with the shower amounts to nothing more than a disagreement with the treatment that he was provided, which cannot amount to deliberate indifference.  From our reading of Snider's second amended complaint, however, it does not appear that Andrus and Rupert were the individuals that provided Snider with the opportunity to take a shower.  Snider's allegations suggest that it was the extraction team of corrections officers that placed Snider in the shower without any soap or solution on April 5, 2013, and when Snider was afforded the opportunity to take a second shower with soap the next morning, it was Smith who gave him permission to do so, rather than any nurse.  Consequently, even if the showers were proper "treatments" with which Snider merely disagreed, Andrus and Rupert seemingly were not the individuals to direct or permit Snider to take these "treatments," and thus, this would not preclude a finding of deliberate indifference on the part of Nurse Rupert and Andrus.

The pepper-spray injuries, as alleged, are sufficient to rise to the level of a "serious" injury, as required by the second prong of the *Estelle* test.  After the April 5, 2013, shower that Snider had to take without any soap or solution to neutralize the pepper spray residue on his skin, the effects of the pepper spray were exacerbated and despite this, Andrus and Rupert allegedly refused to provide any treatment to alleviate this problem.  As a result, Snider experienced pain so severe

that it caused him to shake and prevented him from sleeping the night of April 5, 2013, because he felt as if his skin was on fire.  It was not until the next morning that Smith gave Snider permission to take a second shower with soap to wash off the remaining pepper spray residue and relieve his pain.  Thus, it would not be unreasonable to conclude that the refusal of Andrus and Rupert to treat Snider after his April 5 shower caused him wanton and unnecessary pain.  Furthermore, exposure to pepper spray has been found to be a "serious" medical need, sufficient to support a medical deliberate indifference claim.  *See Passmore v. Iannello*, 2013 WL 625409, at *7 (W.D. Pa. Feb. 20, 2013) (finding a serious medical need after exposure to pepper spray because "a lay person can readily recognize that an individual exposed to pepper spray is in need of some medical assistance to alleviate the effects of the spray."); *Cummings v. Smith*, 2013 WL 5377376, at *2 (E.D. Pa. Sept. 25, 2013) (noting that "the failure to decontaminate prisoners or otherwise provide medical treatment for prisoners exposed to pepper spray can support a claim for the violation of the Eighth Amendment" when such failure causes further injury or unnecessary and wanton infliction of pain).

Thus, we find that Snider has alleged facts sufficient to state a claim of deliberate indifference under the Eighth Amendment, and we recommend that the medical defendants' motion to be dismiss be denied.

**C. Motion to Dismiss – CCCF.**

Count V of Snider's second amended complaint alleges that CCCF violated

Title II of the Americans with Disabilities Act ("ADA") by discriminating against

Snider, failing to provide him with reasonable accommodations for his disability,

and causing him to be excluded from participation in programs and denied services

of a public entity.  Specifically, Snider alleges that even though employees and

administrators at CCCF were aware of his mental illness, they failed to take this

into consideration when determining the amount of force to be utilized, failed to

provide him with any accommodations with respect to the disciplinary process, and

subjected him to ongoing retaliation and harassment related to both his mental

illness and his religion.  CCCF argues that Snider's second amended complaint

fails to establish that CCCF violated Title II of the ADA and, in the alternative,

argues that Snider has not filed his ADA claim against CCCF within the relevant

statute of limitations.


**1. The Merits of Snider's ADA Claim.**

Title II of the ADA states in relevant part that "no qualified individual with a

disability shall, by reason of such disability, be excluded from participation in or

be denied the benefits of the services, programs, or activities of a public entity, or

be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Thus, in

order to state a claim under § 12132, a plaintiff must establish that: (1) he is a qualified individual; (2) he has a disability; (3) he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; and (4) the exclusion or discrimination suffered was by reason of his disability. *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 553 n.32 (3d Cir. 2007); *see also Herman v. Cnty. of York*, 482 F.Supp.2d 554, 566 (M.D. Pa. 2007). The Third Circuit has noted that "enforcing regulations [with respect to enforcement of the ADA] require public entities to 'make reasonable modifications' to their programs and policies in order to avoid discrimination on the basis of disability." *Matthews v. Pa. Dept. of Corr.*, 613 Fed.Appx. 163, 167 (3d Cir. 2015) (citing 28 C.F.R. § 35.130(b)(7)). County prisons, such as CCCF, fall within the definition of the term "public entity" under the ADA. *See Pennsylvania Dept. of Corr. v. Yeskey,* 524 U.S. 206, 210 (1998) (citing 42 U.S.C. § 12131 (1)(B)).

CCCF does not dispute that Snider is a qualified individual with a disability. Instead, it contends that Snider fails to plead facts that would establish that his mental disability prevented him from hearing, understanding, or obeying corrections personnel's orders upon which his misconducts were based. Per CCCF, Snider has not alleged that he was excluded from participation in or denied the benefits of CCCF's services, programs, or activities because of his disability or

that he was otherwise discriminated against, and thus he has fails to state an ADA claim.

CCCF's assertions, however, gloss over Snider's allegations. Snider does allege that his "mental illness affects nearly every aspect of his daily life, including his ability to care for himself and other major life activities such as sleeping, learning, concentrating, thinking and communicating." *Doc.* 222 at ¶21. He further alleges, among other things, that throughout the relevant time period he heard voices, had hallucinations, and experienced depersonalization, derealization, and symptoms of Post Traumatic Stress Disorder. *Id.* at ¶¶50, 51.

CCCF also appears to misread Snider's claim. Snider concedes that he was not treated differently from the other inmates. Rather, he argues that by simply treating him the same as other inmates without disabilities and failing to consider his disability with respect to the disciplinary process, CCCF in fact acted discriminatorily by failing to make accommodations. Snider argues that the actions for which CCCF officials disciplined him, such as failing to wear his name tag, hitting a door, and being disruptive, were manifestations of his mental illness. By issuing him misconducts for these manifestations and by punishing him in the same way other non-mentally ill inmates would have been punished, CCCF failed to accommodate his disability, and, thus, discriminated against him.

At this early stage of the litigation, we conclude that Snider has sufficiently alleged a claim for discrimination under the ADA.   *See Parms v. Pa. Dept. of Corr.*, 2015 WL 1326323 (W.D. Pa. Mar. 25, 2015) (denying motion to dismiss on the basis that plaintiff had adequately alleged discrimination on the part of prison officials where disciplinary sanctions were alleged to have resulted from inmate's alleged disability).   We note that Snider does not specifically state what type of accommodation he was seeking from CCCF.  This, however, is not fatal to his ADA claim because "[a]lthough [Snider's] complaint is not as rich with detail as some might prefer, it need only set forth sufficient facts to support plausible claims." *Fowler*, 578 F.3d at 211-12.  As long as a complaint "pleads how, when, and where [defendant] allegedly discriminated against [a disabled plaintiff]," this is "sufficient to give [a defendant] notice of the basis for [a disabled plaintiff's] claim." *Id*. at 212.  Moreover, a plaintiff need not prove all elements of a *prima facie* ADA case in order to survive a motion to dismiss.  Rather, (s)he must allege only material facts that, "in addition to inferences drawn from those factual allegations, provide a basis for recovery." *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 124 (3d Cir.1998).  Thus, Snider's ADA claim should be allowed to proceed, and we recommend that CCCF's motion to dismiss the ADA claim be denied.

### 2. CCCF's Statute of Limitations Argument.

In its motion to dismiss, CCCF argues that Snider's ADA claim should be dismissed because he did not file it within the applicable two-year statute of limitations.  In response, Snider contends that a four-year statute of limitations should apply to his claim rather than a two-year statute of limitations; thus, Snyder argues that his claim was filed within the applicable statute of limitations, or, in the alternative, he argues that he was entitled to equitable tolling.  Because CCCF never replied to Snider's contentions pertaining to the appropriate statute of limitations and because this issue was not briefed, we deem CCCF's statute of limitations argument to be abandoned and will not consider it at this stage of the proceedings.  If CCCF wishes to brief this issue for consideration at a later date, it may do so.

### III.  <u>Recommendation.</u>

Accordingly, for the foregoing reasons, **WE RECOMMEND** that the medical defendants' motion (*doc. 224*) to dismiss and CCCF's motion (*doc. 226*) to dismiss both be **DENIED**.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being

served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.

Submitted this **2nd** day of **June 2016**.




    ***S/ Susan E. Schwab***
    Susan E. Schwab
    United States Magistrate Judge